Ross Brandon SLUSS, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

2011–SC–000318–MR
2013–SC–000258–MR

Supreme Court of Kentucky.

RENDERED: DECEMBER 18, 2014

COUNSEL FOR APPELLANT: Jerry Alan Patton, Jerry A. Patton, P.S.C., Prestonsburg

COUNSEL FOR APPELLEE: Jack Conway, Attorney General, Perry Thomas Ryan, Assistant Attorney General

OPINION OF THE COURT BY JUSTICE CUNNINGHAM

A tragedy all too familiar to our Kentucky communities occurred on June 24, 2010, in Martin County. On that day, eleven year old Destiny Brewer, a passenger in a SUV, was killed by a vehicle driven by the Appellant, Ross Brandon Sluss. Two other occupants of the SUV, driver Blanche Robinson, and passenger Sage Brewer, received physical injuries in the collision. The Appellant was driving in the wrong lane, and failed a sobriety test at the scene. The initial blood screen showed the presence of marijuana and a number of prescription medications. A urine sample also confirmed this result.

Appellant was indicted and convicted of murder, assault in the first degree, two counts of assault in the fourth degree, driving under the influence of intoxicants,

and tampering with physical evidence. He received a sentence of life in prison.

We reverse, because the trial court did not strike juror Deena Booth for cause.

█ The Court reviews the trial court's decision not to strike Juror Booth for cause, under an abuse of discretion standard. *Adkins v. Commonwealth*, 96 S.W.3d 779 (Ky.2003); *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky.2007). This standard cannot be applied in a vacuum nor based only upon the words of the juror. When viewed in the entire context of this particular case and in compliance with the Criminal Rule and our case law, the trial court erred by not discharging the juror in question.

Kentucky Criminal Rule ("RCr") 9.36 states clearly that "when there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." We must also adhere to the long standing principle "that objective bias renders a juror *legally partial,* despite his claim of impartiality." *Montgomery v. Commonwealth*, 819 S.W.2d 713, 718 (Ky.1991) (emphasis added). Also, the trial court in this case abused its discretion by disregarding the "*probability* of bias or prejudice that is determinative in ruling on a challenge for cause." *Id.* (citing *Pennington v. Commonwealth*, 316 S.W.2d 221, 224 (Ky. 1958)). (Emphasis added).

In our landmark case *Shane*, Justice Noble reaffirmed this Court's commitment to jury selection which is free of bias or prejudice. 243 S.W.3d 336.

"The court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor. There is no 'magical question' that can rehabilitate a juror as impartiality is not a technical question but a state of mind." (*Id.* at 338)

This case was plagued with jury selection problems from the beginning.

█ A motion for a change of venue was filed by Appellant's counsel, pursuant to Kentucky Revised Statute ("KRS") 452.220, along with affidavits by two Martin County citizens attesting that Appellant could not get a fair trial in that county. There were no counter affidavits by the Commonwealth. The matter was passed by the trial court to see if an unblemished jury could be attained. Appellant argues that because his motion for a change of venue met the requirements for a petition under KRS 452.220 and was unopposed by the Commonwealth by either affidavit or witness, his motion should have been summarily granted. As the basis of his argument, he cites *Whitler v. Commonwealth*, 810 S.W.2d 505 (Ky.1991). The issue of technical compliance is not determinative of reversal. In *Stoker v. Commonwealth*, 828 S.W.2d 619 (Ky.1992), this Court noted that *Whitler* "holds, overruling prior authority to the contrary, that the trial court had not abused its discretion in overruling a motion for change of venue, even though the Commonwealth had failed to file counter affidavits or produce witnesses to oppose the motion." *Id.* at 623–24. Having disposed of the technicality argument, the analysis then falls into KRS 452.210, and whether "it appears that the defendant or the state cannot have a fair trial in the county where the prosecution is pending." Therefore, we cannot say that refusal to change the venue on lack of affidavits in and of itself would be an abuse of discretion. We note the statute itself, KRS 452.220, does not require counter affidavits. However, the lack of countervailing proof by the Commonwealth on the motion should always raise the trial judge's antenna for troubling waters ahead in obtaining

a fair and impartial jury in that venue. It apparently did in this case as the trial court acknowledged some difficulty might be encountered in choosing a jury.

It became a ponderous and strained process.

Fifty jurors were excused for cause. There is an "implied bias" established in our case law where a vast number of jurors are struck for cause and a majority of those remaining have had wide exposure to the case. *Jacobs v. Commonwealth*, 870 S.W.2d 412 (Ky.1994) *overruled on other grounds in St. Clair v. Commonwealth*, No. 2011–SC–000774–MR, 450 S.W.3d 279, 2014 WL 4113014 (Aug. 21, 2014). Here, even those jurors remaining were not wholly unaffected by the tragedy.

This is not our first look at the jury selection process in this case.

The first appeal involved a novel issue of law in Kentucky relating to possible interaction between jurors and persons closely affiliated with a criminal case over social-media sites such as Facebook. *Sluss v. Commonwealth*, 381 S.W.3d 215 (Ky.2012). Ultimately, this Court held that it did not have sufficient information relating to the nature and scope of the social-media interaction between two jurors and the murder victim's mother to determine its prejudicial effect. Accordingly, the case was remanded to the trial court to conduct a hearing on the matter and to determine whether Sluss was entitled to a new trial. The Court held the remaining issues in abeyance pending the outcome of the trial court's hearing on remand.

On remand, the trial court conducted two hearings and concluded that the jurors should not have been struck for cause and that Sluss was not entitled to a new trial. That matter is now back before us. However, since we are reversing on a different ground, we deal with it summarily later on in this opinion. Suffice it to say here that one of those jurors did have a Facebook relation with the victim's mother *after* the trial. While that removes the influence at trial, it is graphic evidence of how the collective feelings and opinions of this community have reached out to the suffering of the victim's family.

Furthermore, there was the juror Anthony Preece. He was a constable who was struck for cause, because he had been to the scene of the accident and knew April Brewer. He apparently had a conversation about the case during a break in the trial that could have been overheard by other jurors. Sluss did not object at the time that the juror pool was tainted. Therefore, this issue is not preserved. Sluss's argument is mere speculation, and speculative arguments will not sustain a reversal of a conviction, especially where the appellant seeks palpable error review. However, it is just one more wisp of smoke drifting across the whole jury selection process.

There is also the problem with juror Christina Butcher, raised by the Appellant in this appeal. Sluss, however, did not move to excuse Juror Butcher for cause. During general voir dire, the juror stated that she had some knowledge of the case. She said that she was an employee of Dr. Lon Lafferty, who was the treating physician of several of the victims of the accident and who testified at trial. The judge asked her, "Based on what you know about this case through your work, would it be difficult—would it be fair to say that you have some knowledge that would make it difficult for you to be fair or is it just basic knowledge?" She replied, "It's just basic stuff." Sluss's counsel then raised his concern about Butcher's knowledge of the case, stating: "Your honor, I'd be concerned of any personal knowledge. She may have bias. I mean, she actually

knows probably a decent amount. I know they made visits to there, but everybody goes to the doctor there, I can understand that. But at the same time, she may have some [inaudible]." Given her working relationship with a testifying physician and her office contact with the injured victims, this was a reasonable concern. But, in response, the judge said that he could inquire about that "when we get there," presumably referring to individual voir dire directed to pretrial publicity that was to come later.

Even assuming Sluss attempted to move to strike the juror for cause at that time, the trial judge passed any issues of pretrial knowledge and publicity to the individual voir dire when he told Sluss's counsel he could inquire about it later. But when "later" came, in individual voir dire, Sluss's counsel did not pursue it. He said nothing about removing the juror during or after her individual voir dire, though he had done so with other potential jurors. That constituted a failure to move to strike in the end, which means the claim related to Butcher was not preserved. Preservation of this issue is a close question. But even if we deem it unpreserved for our consideration, it can be chalked up as one more circumstance bringing into question the impartiality of this jury panel.

And then we come to juror Deena Booth.

Juror Booth stated the following: (1) the step dad of the victim worked with her mother at a car dealership; (2) she frequently drove by the accident site and admitted that the memorial to the victim would influence her "a. little;" and (3) she had heard that the person causing the accident took drugs and acted irresponsibly. She *said* that she could set aside what she had heard and try the case only on what she heard in the courtroom. In other words, she gave the magic response

to the "magic question" condemned in *Montgomery,* 819 S.W.2d at 718.

 As an initial matter, we must address the issue of preservation. To properly preserve error based on a trial court's failure to strike a juror for cause, a defendant must at the very least challenge the juror for cause. *Cf.* RCr 9.36 (describing challenges for cause); *McDaniel v. Commonwealth,* 341 S.W.3d 89, 92 (Ky. 2011) (noting the "issue is properly preserved for appellate review by defense counsel's motions to strike."). Beyond that, the defendant must also move to excuse that juror and exhaust all of his peremptory challenges. *Gabbard v. Commonwealth,* 297 S.W.3d 844, 854–55 (Ky. 2009). Further, "to complain on appeal that he was denied a peremptory challenge by a trial judge's erroneous failure to grant a for-cause strike, the defendant must identify on his strike sheet any additional jurors he would have struck." *Id.* at 854. Moreover, "if the other jurors the defendant would have used his peremptory strikes on do not actually sit on the jury," there can be no error. *Id.*

In the present case, there is no doubt—contrary to the Commonwealth's assertion—that Sluss's trial counsel exercised all of his peremptory challenges. A simple review of the juror strike sheets reveals as much. Moreover, it is also equally clear that Sluss moved to strike Juror Booth and used a peremptory challenge to remove her.

 As to juror Booth, the ultimate issue as to preservation is whether Sluss complied with our holding in *Gabbard* that the defendant must identify *on the strike sheet* other jurors he would have struck. Sluss alleges that he "substantially complied" with *Gabbard* by stating orally on the record, during a request for additional peremptory challenges, that if he was

granted additional challenges he would have struck four additional jurors, which he listed by name. This list included Joyce Hedges, who eventually sat on the jury. Sluss argues that this statement on the record was enough to preserve his challenge under *Shane* and *Gabbard.* We agree.

 Perhaps only one of any of the three troubling statements of juror Booth would not have been sufficient grounds for cause. The most troublesome however was the fact that she knew the reputation of the Appellant as being irresponsible and taking drugs. It is inconceivable that even a juror worthy of sainthood could afford a criminal defendant a presumption of innocence in an intoxicated driver homicide case when that juror knows that the defendant has the reputation of being irresponsible and a drug addict. Juror Booth, like most of our good citizens called to jury duty, was no doubt trying her best to be honest in her answers to the voir dire questions. And everyone likes to think they can be fair under any circumstances and are highly reluctant to admit that they cannot. Of course we know better. Judges should know better and not surrender their discretion solely to the spoken words of prospective jurors. That is what *Montgomery* was all about.

A combination of the three associations with the case and its parties most certainly provides a "reasonable ground to believe that juror Booth could not render a fair and impartial verdict."

With our decision here today we follow the common sense decision of *Montgomery.* Over the past 22 years since *Montgomery,* our decisions on strikes for cause have meandered from one side of the road to the other. In recent times there have been volleys fired across the bow through strong dissents, suggesting that trial judges have allowed jurors to virtually talk themselves onto the jury. Some of us on this Court have been baffled and mystified by trial judges in this state who jeopardize their cases by needlessly keeping jurors despite obvious indications of bias. Trial judges are possessed of great authority to enlarge jury panels or change venues. They don't have to imperil their cases with such miserly voir dire practices. Many of our cases post-*Montgomery* regarding jury strikes for cause have contained shots across the bow. These have gone mostly unheeded. Today we fire directly into the bow.

## Change of Venue

 Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, a change of venue must be granted when "it appears that the defendant cannot have a fair trial in the county wherein the prosecution is pending." *Brewster v. Commonwealth,* 568 S.W.2d 232, 235 (Ky.1978); *see also Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences."). Moreover, KRS 452.210 statutorily permits a change of venue when "upon the application of the defendant or of the state ... it appears that the defendant or the state cannot have a fair trial in the county where the prosecution is pending." Whether to grant a change of venue is within the sound discretion of the trial court and will only be disturbed for an abuse of discretion. *Gill v. Commonwealth,* 7 S.W.3d 365, 369 (Ky.1999).

 To obtain a change of venue, "[p]rejudice must be shown unless it may be clearly implied in a given case from the totality of the circumstances." *Brewster,* 568 S.W.2d at 235. In cases alleged to be affected by prejudicial news coverage, such as this one, the defendant must show "that

(1) there has been prejudicial news coverage, (2) it occurred prior to trial, and (3) the effect of such news coverage is reasonably likely to prevent a fair trial." *Id.* (citing *Sheppard,* 384 U.S. at 362, 86 S.Ct. 1507).

It is clear from our discussion of juror problems that the trial court in this case could have granted a change of venue. The trial judge anticipated problems in getting a jury when the Commonwealth failed to respond with affidavits to the Appellant's motion and proof under KRS 452.220(2). His premonition was correct as when jury selection began, fifty were struck for cause and the others remaining created multiple problems as previously discussed, because of the pre-trial publicity. The prosecution arises out of the heart wrenching and sudden death of eleven year old Destiny Brewer in a vehicular homicide in Martin County, Kentucky—a county of less than 13,000 people. There is an old saying that "when a young one dies, we hang our dreams in the closet." Nothing sears the heart strings of a small rural county like the needless death of one of our young. A dark cloud settles over the community. The record reflects that the news coverage and collective grief of the people permeated Martin County.

Time is the only antidote for grief—either individually or collectively. It has been way over four years now since the death of Destiny Brewer and the fatal accident of June 24, 2010. Time moves on and the community endures other calamities, tragedies and events which carry strong emotions. Indeed, an argument could have been made that a change of venue was appropriate because we are unsure whether a fair and impartial jury could have been secured in Martin County. The trial of this matter started on March 28, 2011, only nine months after the tragedy. Feelings and emotions were still raw and had not been treated by the assuaging balm of time.

Therefore we are restrained from mandating a change in venue in this opinion, which is far removed in time from the date of the tragedy and the first trial. We therefore remand this case to the trial court for an appropriate plumbing of the current community knowledge and sentiment, if and when, any change of venue is requested.

**Social-media activity of two jurors**

This is not Sluss's first appeal to this Court. In his first appeal, he raised the issue of the social-media activity of two jurors. *Sluss,* 381 S.W.3d 215. Sluss's second argument involved a novel issue of law in Kentucky relating to possible interaction between jurors and persons closely affiliated with a criminal case over social-media sites such as Facebook. Ultimately, this Court held that it did not have sufficient information relating to the nature and scope of the social-media interaction between two jurors and the murder victim's mother to determine its prejudicial effect. Accordingly, the case was remanded to the trial court to conduct a hearing on the matter and to determine whether Sluss was entitled to a new trial.

On remand, the trial court conducted two hearings and concluded that the jurors should not have been struck for cause and that Sluss was not entitled to a new trial. Sluss has now appealed that decision as a matter of right, and has asked the Court to address the remaining issues it had previously held in abeyance. Ky. Const. § 110(2)(b). Since we are reversing on another ground and the issue of the two jurors will not occur in a retrial, we will not address this issue in detail. Suffice it to say that the record reveals that only one definitively false statement was made by a juror: that juror Matthews said she did not have a Facebook account at the time of

voir dire when she did. The trial judge determined that this falsehood was inadvertent. The other inconsistencies that Sluss alleges are only speculative inconsistencies and are not relevant to the matter at hand. We find that the trial court amply explored the issue on remand and its findings were sufficient to properly deny the motion for new trial on that issue.

**Other Issues**

Appellant raised various other issues in his appeal. Although we are reversing and remanding, we will address in a summary fashion the other issues not covered previously for guidance on retrial.

**A. The trial court did not abuse its discretion by admitting results of Sluss's urinalysis.**

■ Sluss argues that·the trial court abused its discretion by admitting results of a urinalysis test indicating the presence of cannabinoid metabolites, oxycodone, alprazalomam, and hydrocodone. Sluss cites *Burton v. Commonwealth,* 300 S.W.3d 126 (Ky.2009), in which this Court held that the trial court abused its discretion by admitting urinalysis test results of the defendant. *Burton* does not, however, stand for the proposition that urinalysis results are inadmissible in all cases. Where, as here, there is additional admissible evidence that provides context for urinalysis testing results, the admission of those results is not necessarily barred by *Burton.*

■ In the present case, there was additional evidence concerning Sluss's use of marijuana and his impairment. There was the strong odor of marijuana at the scene, Sluss admitted smoking marijuana earlier in the day, and he failed two sobriety tests and showed other signs of intoxication. He also attempted to throw his urine sample in the urinal in order to destroy evidence. This Court simply cannot find that the factual circumstances of this case are the same as those in *Burton,* wherein the only evidence of the presence of cocaine and marijuana came from the urinalysis results. Furthermore, if the urinalysis was introduced in error, it was certainly harmless error in light of the wealth of additional evidence of impairment.

**B. The trial court properly denied Sluss's attempt to present evidence that the victim died as a result of not wearing a seatbelt and that another victim's injuries would not have been as severe had the airbag in the vehicle been functional.**

■ Sluss contends, without citing any authority, that this evidence was relevant to causation, specifically, whether he was the cause of the victim's injuries, and that he should have been allowed to present such evidence as mitigation. This Court disagrees.

■ It is abundantly evident that the issue of causation in homicide cases is framed in terms "of whether or not the result as it occurred was either foreseen or foreseeable by the defendant as a reasonable probability." *Lofthouse v. Commonwealth,* 13 S.W.3d 236, 239 (Ky.2000) (quoting Robert Lawson and William Fortune, *Kentucky Criminal Law* § 2–4(d)(3), at 74 (1998)). The matter of whether a victim was wearing a seatbelt at the time of an accident or the functionality of the air bag in a victim's vehicle is not relevant to whether the defendant was able to foresee the result of his conduct.

**C. The trial court did not err by denying Sluss's motion to suppress statements he made after the accident.**

Sluss complains of multiple violations of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Sluss complains of three errors: (1) that he should have been given *Mi-*

*randa* warnings during the field sobriety test; (2) that the statement he made concerning his use of marijuana earlier in the day should be excluded because he was in custody and had not been told his rights under *Miranda;* and (3) that his statement during the urine sample collection should be excluded.

First, this Court has held that the administration of field sobriety tests when a defendant is not in custody does not warrant *Miranda* warnings. *See Hourigan v. Commonwealth,* 962 S.W.2d 860, 863 (Ky. 1998). The U.S. Supreme Court has held the same. *See Pennsylvania v. Bruder,* 488 U.S. 9, 10, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988) (per curiam). There is no dispute that Sluss was not in custody at the time he was given the field sobriety tests.

Second, Sluss complains that his spontaneous admission that he was smoking marijuana on the day of the accident should be suppressed. There is no dispute that Sluss was in custody at the time he made this statement, but there is no evidence that his statements were given in response to custodial interrogation, as required by *Miranda.*

Finally, Sluss claims that his statements at the clinic while he gave his urine sample should be suppressed. The statements were made after Sluss was in custody and had been read his *Miranda* warnings. Again, the statement does not appear to have been made in response to a question from the deputies. The statement thus did not need to be suppressed.

### D. Sluss was not entitled to a new trial or a judgment of acquittal.

Sluss next claims he was entitled to a new trial and judgment of acquittal for reasons already addressed in this opinion and the Court's previous opinion in this case. And that the Commonwealth failed to show that he was acting wantonly or expressed an extreme disregard for human life.

"The trial court is vested with a broad discretion in granting or refusing a new trial, and this Court will not interfere unless it appears [sic] that there has been an abuse of discretion." *Whelan v. Memory–Swift Homes, Inc.,* 315 S.W.2d 593, 594 (Ky.1958). Moreover, when an appellate court considers a motion for a judgment of acquittal, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). Having previously addressed each of these issues independently and finding each to be without merit, the Court is satisfied that the trial court did not err by failing to grant Sluss a new trial. Furthermore we find there was ample evidence in support of the trial court's refusal to grant a directed verdict.

### E. The prosecutor's remarks during closing argument were not improper.

Implicit in any argument that reversible prosecutorial misconduct has occurred is that the action of the prosecutor must have, indeed, been misconduct. "It is unquestionably the rule in Kentucky that counsel has wide latitude while making opening or closing statements." *Brewer v. Commonwealth,* 206 S.W.3d 343, 350 (Ky. 2006). Moreover, "[a] prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth,* 744 S.W.2d 407, 412 (Ky.1987).

We have reviewed the closing argument complained of by the Appellant and find no error.

**F. Sluss's sentence was not disproportionate to the crime for which he was convicted.**

Since we are reversing and remanding for a new trial, there is no precedential value in our addressing this issue which pertains to a sentence we are vacating.

**G. Deputy Tipton's testimony was not reversible error.**

Sluss complains that the trial court committed reversible error by admitting Deputy Brian Tipton's testimony that Sluss failed the "four finger test." This is a test where the subject places one hand in front of them and then must touch the thumb to the index, middle, and ring finger while counting according to an officer's instruction.

The Commonwealth complains this argument is not preserved. We agree. Sluss's motion to suppress, which he contends preserved the issue, states the test is not a standardized test and is not admissible as relevant under KRE 403. There is no mention in that motion that the test should not be admitted for failure to meet the requirements of expert testimony under KRE 702. There is simply no objection, written or oral, that the testimony failed to meet the requirements of KRE 702. Nor does this alleged error rise to the level of palpable error.

**H. There was probable cause to arrest Sluss.**

■ The facts of the case are that Sluss crashed his vehicle into an oncoming vehicle by crossing over the center line of the roadway. He failed the standardized Horizontal Gaze Nystagmus test, or "HGN" test, twice and the non-standardized finger-count test twice. Two officers, one of whom was familiar with Sluss's normal manner of speech, noted that he had slurred speech. Both officers observed Sluss had glassy eyes. Moreover,

the victims were seriously injured. The circumstances were such that an officer had reasonable grounds to believe that a felony, at least an assault if not a homicide, had been committed, and as such there was probable cause to arrest Sluss.

**I. The admission of Sluss's medical records was not error.**

■ First, Sluss's personal medical records served as the basis of his own expert's opinion. And though Sluss claims the records were introduced by the Commonwealth, a more precise statement is that the records were introduced by Sluss, and the unfavorable fact was introduced by the prosecution. The introduction of the records was part of Sluss's defense strategy that he had developed a tolerance to the medications found in his blood stream after the accident and was not impaired at the time of the collision. As this Court has previously noted, "[t]he data on which expert witnesses rest their specific opinions, as distinguished from the knowledge which qualifies them to offer opinions at all, may be fully inquired into on cross-examination." *Foster v. Commonwealth,* 827 S.W.2d 670, 678–79 (Ky.1991) (quoting 31 Am.Jur.2d *Expert and Opinion Evidence* § 92); *see also* KRE 703.

Sluss's claim that the medical records violated his confrontation rights is simply wrong. The statements in those records were not testimonial as they were not prepared in anticipation of trial. Instead, admissibility of the records was governed by the Kentucky Rules of Evidence.

Sluss raises the issue of authentication of the records in passing. The records were relied on by his own expert witness. If they were not authentic, then that too was improper. Even if the records were not properly authenticated, their admission did not rise to the level of manifest injustice.

### J. There was sufficient proof of the chain of custody.

██ Kentucky Rule of Evidence 901(a) governs the admissibility of tangible evidence, and more specifically, sets out that tangible evidence must be sufficiently identified to be admissible. *See* KRE 901(a) ("The requirement of . . . identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). As this Court has previously held, "a proper foundation requires the proponent to prove that the proffered evidence was the same evidence actually involved in the event in question and that it remains materially unchanged from the time of the event until its admission." *Thomas v. Commonwealth*, 153 S.W.3d 772, 779 (Ky.2004).

In this case, Sluss claims that there was only "vague" testimony about the collection of the blood and urine samples and, specifically, that no chain of custody was established for the sample between its collection in Martin County and its arrival at the state police laboratory in Ashland. Moreover, he hinges much of his argument about the insufficiency of the chain of custody on a comment made by the Commonwealth Attorney in a bench conference during Joseph Wiley's testimony that "I don't like this, this is not a good chain, but it is the best we can do."

We have reviewed the chain of custody in this case. While it may not have been perfect, it is not a case where the chain of custody was not established at all. Sluss likens this case to *Henderson v. Commonwealth*, 507 S.W.2d 454, 461 (Ky.1974), in which the court found that the Common-wealth had not established the chain of custody, though ultimately found it to be harmless, where there was no testimony about the transportation of the evidence between the investigative officers to the crime lab. But, in the present case, there was testimony about the evidence being mailed between Martin County and the crime lab in Ashland.

We find that there was "persuasive evidence that 'the reasonable probability is that the evidence has not been altered in any material respect.'" *Rabovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky.1998) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1532 (10th Cir.1989)). Therefore the challenge to the chain of custody is without merit.

### K. There was no cumulative error.

Sluss complains that because of "the cumulative effect of numerous errors" his convictions should be reversed. We disagree. There was no cumulative error. We reverse only as to the error on the trial court not excusing juror Deena Booth.

### Conclusion

For the foregoing reasons, we reverse Sluss's convictions and sentence and remand this case to the trial court for further proceedings consistent with this opinion.

All sitting. All concur.